**Luther Earl GEORGE, Plaintiff,**

v.

**The CHESAPEAKE & OHIO RAILWAY COMPANY, Defendant.**

**Civ. A. No. 77-70.**

United States District Court,
E. D. Virginia,
Newport News Division.

Sept. 20, 1972.

Henry E. Howell, Jr., Norfolk, Va., for plaintiff.

Robert M. Hughes, III, Norfolk, Va., for defendant.

WALTER E. HOFFMAN, Chief Judge.

Plaintiff, Luther Earl George, seeks payment from his employer, The Chesapeake and Ohio Railway Company (C & O), for maintenance and cure alleged to be due as a result of an operation which was performed upon the plaintiff at a private hospital. He is also seeking damages by way of attorney's fees for failure to pay maintenance and cure. Recovery is sought solely under the principles of general maritime law.

George has been a marine employee of C & O for 48 years and has achieved the status of a tugboat pilot. Since the tugboats are utilized seven days a week and 24 hours a day, George works a 12-hour shift and is off 24 hours; then 12 hours on and 48 hours off; all of which is the equivalent of a 40-hour workweek. His time off is his own and any recall for extra duty during this time is purely optional on his part. He is paid by the hour with no meals and lodging being provided by the company.

For the past 15 years George has been afflicted with recurrent sores in his mouth and gums. He has treated himself for this condition with warm salt water rinses, such treatments being taken both on board the tugs and at home. In June 1967 while serving as pilot on the Tug A. T. LOWMASTER, a sore de-

veloped which did not respond to the accustomed treatment. His condition became so aggravated that George went to see Dr. Kupcuoglu, a private ear, nose and throat specialist, who took a biopsy of the lesion.

Upon learning of the ulcer's cancerous nature, George reported to the C & O boatmaster as required by company regulations. The boatmaster sent plaintiff to a local company doctor who, in turn, referred him to the C & O Railway Employee's Hospital Association's hospital at Clifton Forge, Virginia, where he was seen by Dr. Charles. George was given the same diagnosis and advised of alternative remedies—radical surgery or conservative treatment by way of x-ray therapy. Dr. Charles, who represented himself as having been a doctor on a transoceanic passenger liner, told the plaintiff he would perform the surgery, if such course was undertaken.

Due to the very serious nature of the operation which in effect amounted to the removal of one-third of the face, as explained by Dr. Charles to his wife, George elected to undergo the x-ray treatment. While evidence subsequent to the eventual operation revealed that the C & O hospital had a plastic surgeon [1] from Roanoke, Virginia, as a consultant, and indeed Dr. Charles himself might very well have been qualified to perform the operation, none of this information or special qualifications was relayed to the plaintiff at the time of his decision.

The hospital at Clifton Forge was without the proper facilities to administer radiation therapy, so George returned to his home in Newport News, Virginia. The boatmaster did not send George to the Marine Hospital in Norfolk [2] for free treatment but arranged for a series of cobalt treatments at a private hospital, which were paid for without question by the C & O.

Upon his return to Newport News on July 3, 1967, George sought the advice of Dr. Thompson, his family physician. Realizing the gravity of the situation, Dr. Thompson sent the plaintiff to Dr. Charles Horton, a highly qualified plastic surgeon in Norfolk. It was Dr. Horton's considered opinion that such an operation should be performed only by a qualified plastic surgeon due to the extensiveness, the anatomical location, and the pathological grade of the disease; and he was quite emphatic about not having such an operation performed at the Clifton Forge hospital.

Since Dr. Horton believed the x-ray treatments advisable prior to any operation, George pursued that course of action. As a result of such treatments, there was an apparent remission of the disease for six months. Early in February 1968, George noticed a lump in his neck and returned directly to Dr. Horton, without notifying the company boatmaster. The plaintiff was told that, unless he was operated upon immediately, he could not expect to live longer than two months. There was much discussion at that time by George and Dr. Horton as to where the operation should be performed, with some mention of the United States Marine Hospital in Norfolk. Although these operations had been performed at the Marine Hospital, and in all probability Dr. Horton would be the operating surgeon, Norfolk General was designated as the hospital of choice since this was the only location at which the post-operative period of intensive care with constant supervision was available, as required by these critical cases.

The operation was in fact performed at Norfolk General, a private hospital,

---

1. There is some evidence from the deposition of Dr. Charles Horton that Dr. Moorman had not qualified as a plastic surgeon at the time of George's visit to Clifton Forge.

2. Testimony reveals that the hospital in Norfolk was not equipped to administer radiation therapy but that if anyone needing such treatment was admitted, he would be transferred to a location where it was available.

and George was placed in the intensive care unit for the following five days, being seen at least three times each day by one of several doctors. After a substantial recuperative period George returned and is currently employed by C & O as a tug pilot.

It is important to note that at no time did the C & O boatmaster suggest that George go to the Marine Hospital; nor did the plaintiff request to be sent there. While it is true that George had the authority to issue "hospital tickets" to members of his crew allowing them to enter the Public Health facilities in Norfolk, only the boatmaster could do the same for him as a pilot.

The issues, stated broadly, are simply: Whether George is a seaman who is due maintenance and cure for this malady; and, if so, whether his conduct amounted to such willful misconduct as to forfeit his rights. Finally, whether C & O's conduct was such as to warrant an award of damages by way of attorney's fees.

■ Maintenance and cure are ancient maritime remedies which were founded upon humanitarian considerations of the unique perils of the traditional "blue water sailors." See Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949); Harden v. Gordon, Fed.Cas. 6047 (C.C.Me., 1823). They were developed to ensure the welfare of these individuals being injured or falling ill far from home. However, courts have refused to deny recovery to a seaman "merely because his voyages are short, because he sleeps ashore, or for other reasons his lot is more pleasant than that of most of his brethren." Weiss v. Central Railroad Company of New Jersey, 235 F.2d 309, 313 (2 Cir., 1956). See, e. g., Hudspeth v. Atlantic & Gulf Stevedores, Inc., 266 F.Supp. 937 (E.D.La., 1967). Thus, the mere fact that George was a "seaman" for only 12 hours at a time is not fatal to his claim for maintenance and cure.

■ Since there is no distinction among types of seamen, the plaintiff in this case must bear the ordinary burden of proof before there can be any recovery. He must allege and prove facts bringing himself within scope of the remedy. Prendis v. Central Gulf Steamship Company, 330 F.2d 893 (4 Cir., 1963). The essential factors of a maintenance and cure case are that he was a seaman and secondly, that his illness occurred, was aggravated, or manifested itself while in the ship's service. No question has been presented as to George's status as a seaman in the general sense. The controversy lies in the interpretation to be placed on the second requirement.

■ The phrase "in the service of the ship" has become one of art in this field. Since maintenance and cure has been characterized as an implied contractual obligation, Aguilar v. Standard Oil Co., 318 U.S. 724, 730, 63 S.Ct. 930, 87 L.Ed. 1107 (1943), it is obvious that a seaman is thusly engaged while he is performing his assigned tasks on board ship. It is clear, however, that the illness or injury need not arise out of the seaman's employment, nor need it rest on the culpability of the employer. Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 527, 58 S.Ct. 651, 82 L.Ed. 993 (1938). Therefore the Supreme Court, in keeping with the benevolent nature of the remedy, has liberally construed the phrase so as to encompass a seaman who is ashore on authorized leave tending to purely personal business. Aguilar v. Standard Oil Co., *supra*. Additionally, a seaman is deemed to remain "in the service of the ship" as long as he is generally answerable to the call of duty. Farrell v. United States, *supra* at 516, 69 S.Ct. at 709.

■ Due to the nature of his employment, George no longer remains in the ship's service when he leaves his vessel at the completion of his shift. It would be a contravention of the basic principles underlying the shore leave cases to hold that he was on authorized shore leave every night upon returning home. The philosophy behind extending maintenance and cure to apparently personal

adventures stems from the restrictive life led by seamen on lengthy voyages. Such a seaman is in a sense serving the ship while ashore since the time off makes him a more efficient crew member; not to mention the fact that no one would become a sailor if he were denied shore leave. Aguilar v. Standard Oil Co., *supra*. In the present case, the purpose for leaving every night is merely to allow the plaintiff to live a normal home life, and therefore cannot be said to serve the ship to such an extent as to justify his absence on shore leave. Sellers v. Dixilyn Corporation, 433 F.2d 446 (5 Cir., 1970), cert. denied, 401 U.S. 980, 91 S.Ct. 1214, 28 L.Ed.2d 332 (1971). Likewise the plaintiff was not answerable to the call of duty during his off hours. While there is some indication of the willingness of George to return if called, this is immaterial. In order to raise the obligation of maintenance and cure on the part of an employer, there must be a corresponding obligation by seamen to return if called. It is because the seaman remains bound to the vessel that the employer must care for him even while away from the ship. Baker v. Ocean Systems, Inc., 454 F.2d 379 (5 Cir., 1972); Haskell v. Socony Mobil Oil Company, 237 F.2d 707 (1 Cir., 1956).

Since George no longer remains in the ship's service once he leaves the vessel, in order to bring himself within the protection of maintenance and cure his cancer must have either "occurred, become aggravated, or manifested itself" while he was on board his vessel. The application of this test is complicated by the fact that the plaintiff's maladies are merely manifestations of a slow and insidious disease from which he apparently has been suffering for 15 years. This is not the case of some traumatic accident which originates at an identifiable point in time or an illness whose first manifestation is disabling. There is grave doubt as to the exact time the cancer commenced, as well as doubt concerning the location where it first manifested itself, but it may be said with certainty that the disease originated, progressed, and previously manifested itself while George was employed as a seaman for C & O. Obviously this malignancy was present during his daily periods of being in the service of his ship and, therefore, George is entitled to maintenance and cure. Petition of the United States, 303 F.Supp. 1282, 1311 (E.D.N.C., 1969), aff'd 432 F.2d 1357 (4 Cir., 1970).

Even though a plaintiff has shown himself to be entitled to maintenance and cure, he may forfeit this right by his own willful misconduct. Warren v. United States, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503 (1951). However, such a defense must be affirmatively alleged and the burden of proof rests upon the defendant. Gulledge v. United States, 337 F.Supp. 1108, 1112 (E.D.Pa., 1972). It has been contended that the election of George to be operated upon by a private physician in a private hospital amounted to such willful misconduct as to bar any recovery for maintenance and cure.

As a general rule where an employer has offered hospital services which are voluntarily refused by the seaman, any obligation of maintenance and cure is relieved. Murphy v. American Barge Line Co., 169 F.2d 61 (3 Cir.), cert. denied 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406 (1948). While this rule is not applied inflexibly, Rodgers v. United States Lines Co., 189 F.2d 226 (4 Cir., 1951); Luth v. Palmer Shipping Corp., 210 F.2d 224 (3 Cir., 1954), it is clear that if the proffered medical assistance is rejected on personal grounds without some showing of its inadequacy, all rights have been forfeited. Truman v. Chas. Kurz & Co., 239 F.Supp. 636 (D. Or., 1965). Therefore, George's conduct must be examined in light of all the surrounding circumstances to determine whether it was justified or merely some purely personal choice.

The fact that George went to a private doctor initially for a diagnosis has no effect on his claim for mainte-

nance and cure since a seaman has a right to know whether his condition is such that he should be hospitalized. Roberson v. S/S American Builder, 265 F.Supp. 794, 798 (E.D.Va., 1967). The important consideration is his compliance with the company regulations upon determining the seriousness of his illness. Likewise, the plaintiff's decision to undergo radiation therapy should not prejudice his rights. Normally the advice of an expert must be followed, except when grave and severe operations are involved. Murphy v. American Barge Line, *supra*. The rule then becomes whether a reasonable man would submit to surgery under similar circumstances. Haughton v. Blackships, Inc., 334 F.Supp. 317, 319 (S.D.Tex., 1971). It was not unreasonable for George to elect the more conservative treatment based upon the nature of the operation and the apparent qualifications of the staff as related to him at Clifton Forge.

It is also contended that the visit to the private physician, after having received free advice, was improper based on the rationale of Roberson v. S/S American Builder, *supra*. That case is clearly distinguishable upon its facts. There the seaman did not agree with the treatment prescribed by the Public Health Service, and sought private services in order to receive the care which he desired. Additionally, the Marine Hospital eventually offered to perform the operation but this offer was rejected by the seaman so as to pursue his private remedy. Here there is no question as to what course of action was necessary. The reason for refusal was a belief in the inadequacy of the employer's facilities. The court in *Roberson* found "nothing in this record to indicate that the facilities or treatment afforded Roberson were inadequate", while at the same time recognizing the rule that recovery for private treatment is allowable if proper and adequate care was not available at the free hospital, 265 F. Supp. at 797. So lack of confidence in the services offered may be a valid rea-

son for refusing them. Truman v. Chas. Kurz & Co., *supra* at 638.

This court must look to the reasonableness of George's belief in the inadequacy of the Clifton Forge Hospital as the determinative factor in this case. George had been told by the company's general surgeon in Newport News that he was unable to do the required work. At Clifton Forge he learned of the radical nature of the operation and was told that another general surgeon would operate. Upon talking with his private physician he was advised that the operation should only be performed by a certified plastic surgeon and was strongly advised against having it done at Clifton Forge. When viewed against these facts we must conclude that a reasonably prudent man would have refused treatment at the company hospital and would have sought private help.

 While it is true that an employer need not be responsible for supplying the best available care for a seaman, the standard of care required is directly proportionate to the seriousness of illness. Fitzgerald v. A. L. Burbank & Co., 451 F.2d 670 (2 Cir., 1971). George was justified in expecting something more than ordinary care for his aggravated condition. He was also justified in relying on the expert recommendation of his doctor. *Cf.* Murphy v. American Barge Line, *supra*. Since there was no representation made to the plaintiff that a plastic surgeon was available at Clifton Forge, he merely sought privately benefits not otherwise obtainable. Calmar Steamship Corp. v. Taylor, *supra* at 531, 58 S.Ct. 651. George made a bona fide attempt to avail himself of the tendered services but, under the circumstances, was forced to obtain appropriate treatment elsewhere, therefore C & O is liable for the reasonable expenses so incurred. Van Camp Sea Food Co. v. Nordyke, 140 F. 2d 902, 907 (9 Cir., 1944).

As a final grounds for defense, C & O claims that even if its facilities at Clifton Forge were inadequate, George was

still under a duty to avail himself of treatment at the Marine Hospital in Norfolk, Virginia. There is some conflict as to the seaman's responsibility in going to a Marine Hospital absent some affirmative request by the employer; compare Norris, The Law of Seamen, section 594, p. 685, with Stevens v. R. O'Brien & Co., 62 F.2d 632, (1 Cir., 1933). Assuming arguendo that a seaman is so obligated, there are still certain "exceptional circumstances" which would excuse such conduct.[3]

■■■■ There is no rule which says that an employer is obligated to satisfy its duties of care and cure by utilizing the services of the Marine Hospital. Therefore, when a shipowner elects to satisfy this duty by some other means which turns out to be inadequate, he should not be able to defeat a subsequent claim for maintenance and cure by alleging the seaman's failure to go to the Marine Hospital which was never offered. C & O had, by its conduct, indicated that resort to the Marine Hospital was unnecessary. In 1965 the company doctor sent George to a private physician to care for a back ailment and C & O paid for a subsequent back operation. In 1967, when radiation therapy became necessary and was unavailable at Clifton Forge, C & O arranged for the treatments, not at the Marine Hospital but at a private hospital in Newport News. This is not the case of a request by a seaman and mere silence on the employer's part, but rather a request and an offer of aid which happens to be inadequate. In this case, absent an affirmative request by the employer to go to the

Marine Hospital, there is no obligation upon the seaman to do so.[4]

■■ The plaintiff has made a claim for damages by way of counsel fees, but this court is not inclined to find this a proper case for such recovery. The Supreme Court has allowed awards of counsel fees out of some idea of "equitable costs" intertwined with the concept of damages. Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). However such damages do not automatically flow from the mere necessity of bringing a suit to enforce the right to maintenance and cure. Indeed, the subsequent cases have looked to such words as "callous," "recalcitrance," and "wilful," which were used by the court as guidelines in denying or awarding such damages. Roberson v. S/S American Builder, *supra* at 799; Pyles v. American Trading & Production Corporation, 244 F.Supp. 685 (S.D.Tex., 1965); Roberts v. S. S. Argentina, 359 F.2d 430 (2 Cir., 1966). Clearly there was a substantial question as to George's right to receive reimbursement, which payment was duly considered by C & O Railway and refused. Since they were acting neither callously nor in bad faith, the claim for damages by way of counsel fees must be denied.

For the reasons stated above, the defendant shall pay the agreed expenses incurred by the plaintiff in achieving maximum cure and maintenance for a period of one hundred and fifty-one days.[5] The claim for damages by way of counsel fees will be denied. A judgment order shall be prepared and presented, after endorsement by both

---

3. Several "exceptional circumstances" have already been recognized. Lack of proper and adequate cure was noted in Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961), and impaired mental judgment is another, Simmons v. Boat Andrea G. Corporation, 255 F.Supp. 471 (D.Mass., 1966).

4. There is also evidence to the effect that the Marine Hospital was not the hospital of choice because it lacked the facilities for the required post-operative observa-

tion which is critical in these cases. Although the same operation had been performed at the Marine Hospital, we find that a reasonably prudent man would have selected Norfolk General Hospital in light of Dr. Horton's advice.

5. While there was some controversy at trial and presented in the post-trial briefs as to the number of days George was an outpatient and thereby his entitlement to maintenance, the parties have mutually agreed upon this as the accurate figure.

counsel. Interest shall run from the date of judgment as to the medical and hospital expenses, but shall be computed as to maintenance on a weekly basis at the rate of six (6) per centum per annum.