**Richard MESSIER, Plaintiff,**

v.

**BOUCHARD TRANSPORTATION, Defendant.**

**No. 08 Civ. 09505(CM).**

United States District Court, S.D. New York.

Nov. 22, 2010.

Roberta Ellen Ashkin, Law Offices of Roberta Ashkin, New York, NY, Dennis Michael O'Bryan, Howard Michael Cohen, O'Bryan Baun Choen Cuebler Karamanian, Birmingham, MI, for Plaintiff.

Daniel J. Fitzgerald, John Joseph Walsh, Freehill, Hogan & Mahar, LLP, New York, NY, for Defendant.

DECISION AND ORDER DENYING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

McMAHON, District Judge:

### INTRODUCTION

Plaintiff Richard Messier originally filed this maritime action pursuant to the Jones

Act, alleging negligence and unseaworthiness. He also asserted that he was entitled to maintenance and cure pursuant to general maritime law, because he suffered from B-cell lymphoma, a form of cancer, while serving as a seaman aboard the Tug Evening Mist ("Evening Mist"), a vessel owned by Defendant Bouchard Transportation Co., Inc. ("Bouchard"). Plaintiff has since dropped his Jones Act claim.[1]

Plaintiff's claim for maintenance and cure presents what counsel claim is a question of first impression in this Circuit: what does it mean to "manifest" a disease for admiralty purposes? More specifically, can a plaintiff obtain maintenance and cure for an illness that was asymptomatic during the entire time he was serving on the vessel, and that was not diagnosed until over a month after his service ended—but which he undoubtedly contracted some months earlier, and suffered from (albeit without exhibiting any symptoms) while he was in the service of the defendant's ship.

The parties have cross-moved for summary judgment on this question. I deny Plaintiff's motion and grant Defendant's. The disposition of the cross motions for summary judgment renders Plaintiff's motion for leave to amend moot.

## BACKGROUND

The facts are taken from the parties' Rule 56.1 Statements of Fact, the original complaint and exhibits accompanying the parties' motions for summary judgment. The pertinent facts are not disputed.

Messier has worked more than forty years as a seaman on tugboats. In March of 2004, Messier was hired by Bouchard to work as a seaman. During his employment, Messier worked three-week "hitches;" three weeks on, followed by three weeks off.

In September 2005, Messier was assigned to work as the relief captain on the Bouchard vessel the Evening Mist. (Aff'n of John J. Walsh, Sep. 4, 2009 ("Walsh Aff'n") Ex. B at 63–64.) Messier recalls working at least two hitches on the Evening Mist. (Id.)

The final day of what was ultimately Messier's last hitch aboard the Evening Mist was October 23, 2005. (Id.; Walsh Aff'n Ex. D.) The Evening Mist was located at the Caddell Shipyard drydock in Staten Island New York tied up alongside a barge owned by Caddell. (Walsh Aff'n Ex. B at 64–66.) Because the Caddell barge was between the Evening Mist and the dock, Messier and the other seamen working on her had to use two ladders in order to either embark or disembark from the Evening Mist—one ladder to get from the Evening Mist to the barge, and another ladder to get from the barge to the dock. (Id. at 65).

At the end of each hitch, it was the custom for the replacement crewmembers to hold the ladders while the retiring crewmembers disembarked. (Id.) Messier contends that his relief on October 23, Captain Richard Thurlow, did not hold the ladder while Messier was disembarking, as a result of which Messier slipped while climbing down the ladder that led from the barge to the dock.[2] (Id. at 66–67.) Messi-

1. Plaintiff moved for leave to file an amended complaint by dropping the Jones Act claim and proceeding in admiralty on his maintenance and cure claim (Docket # 28). The court granted plaintiff permission to drop his Jones Act claim at a conference on October 26, 2010; however, I indicated that his admiralty claim for maintenance and cure would be tried to a jury, since defendant had relied on plaintiff's jury demand, which was made two years ago.

2. This was the subject of plaintiff's Jones Act claim, now withdrawn.

er began suffering back pain the following day, so he sought treatment for his injury from his primary care physician, Dr. Bradley Ruben. (*Id.* at 73–75.)

Dr. Ruben diagnosed Messier with a probable back sprain.[3] (*Id.*) Messier testified at his deposition that his back pain subsided completely within a couple of days after his fall. (*Id.* at 74.)

Dr. Ruben also ordered routine blood tests, for which Plaintiff's blood was drawn on October 25, 2005. (Walsh Aff'n Ex. E, Medical Record by Dr. Ruben ("Ruben Medical Records").) On October 28, 2005, Dr. Ruben called Messier and advised him that the blood test revealed some elevation in his creatinine level. (Walsh Aff'n Ex. B at 75; Ex. E, Ruben Medical Records.) Medical records indicate that Messier's creatinine level on October 28, 2005 blood-test were 2.2 mg/dL. (Walsh Aff'n, Ex. E October 28, 2005 Lab Results.) Messier's blood was tested a second time, on November 2, 2005; in just a week his creatinine level had risen to 8.0 mg/dL. (Walsh Aff'n Ex. E, November 2, 2005 Lab Results.) Dr. Ruben was sufficiently alarmed about the rising levels of creatinine in Messier's blood that he sent Messier to the emergency room at Citrus Memorial Hospital on November 4, 2005. (*Id.*) Plaintiff was admitted to the hospital for treatment of renal failure. (Walsh Aff'n Ex. E, Hospital Admission Report by Dr. Ruben ("Ruben Admission Report") at 1.)

During his four day hospitalization, Dr. Ruben noted that Messier exhibited no physical "symptoms of renal failure such as decreased urinary output, nausea, vom-iting, gittyness [sic], etc." (*Id.* at 1–2.) A renal sonogram performed while Messier was admitted indicated "mild atrophy of Messier's right kidney compared to left, mild hydronephrosis at the left kidney, and multiple small cortical cysts in the right kidney." (*Id.*) Messier was discharged from the hospital after a stent was placed in his kidney. (*Id.*) At the time of his discharge, Messier's creatinine level had gone back down to just below the level reported on his October 28, 2005 blood-test. (*Id.* & Walsh Aff'n Ex. E October 28, 2005 Lab Results.)

Following his discharge Messier underwent additional tests, including a CT scan of the abdomen, to try to ascertain why his kidneys had failed. (Attachment to September 15, 2009 Decl. of Timothy A. Brant M.D. ("Brant Decl."), January 13, 2006 Letter Report by Dr. Timothy Brant to Dr. William Harrer ("Brant Letter") at 1–2.) In late December 2005—two months after he left the Evening Star—Messier was diagnosed with B-cell lymphoma. (*Id.*)

From January 2006 until October 2006, Messier suffered bouts of debilitating symptoms resulting from his lymphoma and the effects chemotherapy and radiation treatment. (Walsh Aff'n Ex. B at 36–37.) He did not return to work until October 2006. (*Id.* at 33–34.) By that time, his illness had subsided, and Messier was able to begin working for a different shipping company. (*Id.*)

On November 5, 2008, Messier filed the instant complaint. The case was originally assigned to the Hon. Peter K. Leisure. It

---

**3.** Bouchard argues that Messier's testimony about injuring his back and seeking medical treatment for that injury is not sufficiently supported by the evidence before the Court; however, it is undisputed that plaintiff fell on October 23, 2005, and the evidence suggests no other reason why he consulted his physi-cian immediately thereafter. As Plaintiff has dropped his Jones Act claim, any disputed issue of fact on this point would be immaterial, but the court concludes that there is no genuine issue of fact about the reason why Plaintiff initially consulted his doctor.

was transferred to this Court's docket on October 1, 2010, when Judge Leisure retired. The summary judgment motions were fully briefed and ripe for decision.

## DISCUSSION

### I. STANDARD OF REVIEW

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

█ To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. Summary judgment is designed to flush out those cases that are predestined to result in directed verdict. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997).

### II. CROSS MOTIONS FOR SUMMARY JUDGMENT

Both parties have moved for summary judgment on the issue of whether Messier is entitled to "maintenance and cure." Plaintiff suggests two possible theories of recovery: first, that his illness manifested while he was in the service of Bouchard's ship; and second, that his illness manifested at a time when he was otherwise entitled to maintenance and cure.

Insofar as Plaintiff's first theory is concerned, the relevant facts are undisputed, and the cross motions raise a pure question of law: did Messier "manifest" his B-cell lymphoma while he was "in the service of the ship?" That depends on whether the word "manifest" is a synonym for "have"—even if the disease is asymptomatic throughout the period of the seaman's work for the defendant—or whether one must "show symptoms" of a disease while in service of the ship in order to "manifest" it. If the former, then Messier is entitled to summary judgment directing that he be paid maintenance and cure; if the latter, then Bouchard is. The question is certainly one of first impression in this Circuit; and as far as this court is aware it is a question that has been addressed—and only in passing—in just one district court case from another Circuit.

Insofar as Plaintiffs second theory is concerned, the issue seems to be whether Messier can collect maintenance and cure for a secondary complaint when he was not collecting for his primary complaint.

## A. General Principles of Maintenance and Cure

The doctrine of maintenance and cure is rooted in Article VI of the Rules of Oleron, promulgated in about 1160 A.D. *See* 2 R. Force & M. Norris, *Law of Seamen* § 26:6 (5th ed. 2003). The doctrine is part of the general maritime law. *The Osceola*, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). According to Force and Norris, *The Law of Seamen, supra*, at § 26.1, "Maintenance and cure is to the seaman almost what workmen's compensation is to the land worker. Unless his illness or injury has been brought about by his act of willful misconduct, he is certain of receiving compensation intended to be sufficient to pay for his care with his employer assuming the responsibility of his medical expenses." *Id.*

The obligation to "cure" requires a shipowner to provide medical care, free of charge, to a seaman who is injured in the service of the ship, until the seaman has reached "maximum medical cure." *Id.* at § 26.3. The obligation to "cure" a seaman includes the obligation to provide him with medications and medical devices that will improve his ability to function, even if they do not improve his actual condition. *Id.* They may include long term treatments that permit him to continue to function well. Common examples include prostheses, wheelchairs, and pain medications. *Id.*

The obligation of "maintenance" requires the shipowner to provide a seaman with his basic living expenses while he is convalescing. *Id.* Once a seaman is able to work, he is expected to maintain himself. Consequently, a seaman can lose his right to maintenance but still be entitled to cure on a continuing basis. *Id.*

Maintenance and cure "are ancient maritime remedies which were found upon humanitarian considerations of the unique perils of the traditional 'blue water sailors.'" *George v. Chesapeake & Ohio Ry., Co.*, 348 F.Supp. 283, 286 (E.D.Va.1972), (*citing Farrell v. United States*, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949)). However, while the doctrines were developed to ensure the welfare of sailors who became ill or injured while far from home, they have been expanded to "commuter seamen" as well. *Weiss v. Central Railroad Co. of New Jersey*, 235 F.2d 309, 313 (2d Cir.1956).

A ship-owner's liability for maintenance and cure is not fault-based. *See Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527, 58 S.Ct. 651, 82 L.Ed. 993 (1938). The injured or sick seaman need not prove negligence on the part of the ship-owner or anyone else in order to prevail on a claim of maintenance and cure. *Id.*

Of critical importance for our case, maintenance and cure is the traditional form of compensation paid to a seamen who becomes ill or injured *while in the service of the ship*. *Warren v. United States*, 340 U.S. 523, 525, 71 S.Ct. 432, 95 L.Ed. 503 (1951). To be eligible for maintenance and cure, the injury or illness suffered by the seamen must occur, become aggravated or manifest itself while the seaman is "in the service of his ship." *See Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 730, 63 S.Ct. 930, 87 L.Ed. 1107 (1943). Under Second Circuit precedent (which is, of course, binding on this court), a seaman whose illness or injury manifests after conclusion of his or her employment with the shipowner is generally not entitled to recover for maintenance and cure unless there is "convincing proof of causal connection" between the injury or illness and the seaman's service. *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 52–53 (2d Cir.2004). Any doubts or ambiguities

about a seaman's right to receive maintenance and cure must be resolved in his favor. *Vaughan v. Atkinson*, 369 U.S. 527, 532, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).

■■■■■ A seaman who is required to sue a shipowner to recover maintenance and cure may also recover his attorneys' fees. *Id.* If a shipowner's breach of its obligation to provide maintenance and cure is willful and wanton, the shipowner may be subject to punitive damages. *See Atlantic Sounding Co. v. Townsend*, —— U.S. ——, 129 S.Ct. 2561, 2566, 174 L.Ed.2d 382 (2009).

## B. Plaintiff's First Theory: His Illness "Manifested" While In the Service of the Ship

Plaintiff's first theory is that his illness manifested while he was working for Bouchard. It is this theory that presents what appears to be a novel question of law in this Circuit and elsewhere: what does it mean to "manifest" a disease while in the service of a ship?

Plaintiff argues that a person "manifests" a disease if he has it—even if the disease is completely asymptomatic and does not interfere with a seaman's work on board the ship, and even if it is not diagnosed (or even suspected) until after the seaman has left the service of the ship.

Defendant urges that "manifesting" a disease requires exhibiting symptoms of the disease during the period while the seaman is in the service of the ship. Since Messier forthrightly testified that he did not recall suffering any symptoms that might have been related to his lymphoma during his final hitch aboard the Evening Mist (Walsh Aff'n, Ex. B at 109), Bouchard argues that this concession bars Messier from recovering for maintenance and cure.

No one has argued that the verb "to manifest" is some sort of term of art in maritime law. Its dictionary definition is "to make evident or certain by showing or displaying," *see Webster's New Collegiate Dictionary*, 699 (5th ed. 1977); or "to show or demonstrate plainly." *The American Heritage College Dictionary*, 841, (4th ed. 2002). These definitions, which are in essence identical, are decidedly unhelpful to Plaintiff, who showed and displayed nothing indicative of his lymphoma while he was in the service of Bouchard's ship. *Webster's* identification of "latent" as the antonym of "manifest" is also unhelpful to Messier; at best, Plaintiff's lymphoma was latent during his tour.

The parties have not cited, and the court has not found, any Second Circuit maintenance and cure case that defines what it means to "manifest" a disease. For that matter, the parties have not cited any case in which the issue presented was the meaning of "manifestation."

*Wills supra*, is the Second Circuit's most closely analogous maintenance and cure case, since (as in this case), the plaintiff had a cancer that was not diagnosed until after his employment with defendant ended. *Wills*, 379 F.3d at 37–38. However, the issue presented in *Wills* was the competency of plaintiff's evidence about manifestation. *Id.* at 46–47. Plaintiff's decedent died of squamous cell carcinoma, which was not diagnosed until after his employment with defendants concluded. *Id.* at 37. Plaintiff contended that the decedent's illness "manifested" itself during his employment aboard defendants' ships. *Id.* at 52. Alternatively, she argued that her husband's disease had been caused by exposure to toxic chemicals aboard the ship, so she was entitled to maintenance and cure even if the disease did not manifest while he was in the service of the ship. *Id.*

To support her case, the plaintiff in *Wills* submitted an affidavit from one of

her husband's fellow seaman, Miller, who testified that the decedent had complained during his employment about symptoms in 1995. *Id.* at 39. The Second Circuit held that Miller lacked the medical training or expertise needed to allow a trier of fact to conclude reliably that the cancer had presented itself while decedent was in defendant's employ. *Id.* at 49. The fellow seaman's evidence was also insufficient to establish any causal connection between the decedent's work for defendants and his contracting the fatal cancer. *Id.* In short, *Wills* stands for the proposition that the manifestation of a disease has to be proved by competent testimony-especially when the seaman is unable to testify himself.

The plaintiff in *Wills* appears to have assumed that her husband had to have exhibited some symptoms of his disease while on board in order to recover maintenance and cure, and nothing in the Second Circuit's decision suggests that her assumption was incorrect. Nonetheless, Plaintiff here argues that his cancer "manifested" while he was serving on the Evening Mist, because he was in fact sick with the disease at the time of his last shift-even though the disease was not diagnosed until he was no longer in the service of the ship. And while Plaintiff here does not offer any evidence about showing symptoms of his disease during his last hitch, Messier does offer competent medical testimony to establish that he in fact con-

tracted B-cell lymphoma well before it was serendipitously diagnosed. Dr. Timothy A. Brant, one of Plaintiff's treating physicians, avers that Messier's lymphoma "existed for at least several months prior to my January 13, 2006 report, which would include September/October 2005." (Brant Decl. ¶ 3.) Dr. Brant's affidavit supports an inference that Plaintiff had his lymphoma while he worked his hitch on the Evening Mist. Defendant offers no medical evidence to the contrary and utters no serious challenge to Dr. Brant's credentials. So the doctor's testimony stands unrebutted, and the Court will decide the summary judgment motion on that basis.[4]

Still, while Plaintiff offers the quantum of expert evidence that the plaintiff in *Wills* lacked, the proof he submits still begs the question: even if Messier had his cancer during the September/October 2005 time period, did he "manifest" the disease (or, to use the Second Circuit's terminology in *Wills*, did the disease "present" itself, *see*, *Wills*, 379 F.3d at 45) if he showed no symptoms while he was in the service of the ship?

The parties have called the court's attention to two Court of Appeals cases, one from the Third Circuit and one from the Sixth Circuit. One of those cases explicitly requires that a seaman show some symptoms of her illness while in the service of the ship; the other declined to

---

4. Defendant argues that Dr. Brant's testimony ought not be received because it is improper under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.1995). However, Defendant merely states, in conclusory fashion, that Dr. Brant "provided no basis for his opinion." Defendant offers not so much as a scintilla of evidence about why Dr. Brant's opinion is either inadequate or contrary to medical and scientific principles—let alone evidence from anyone who is competent to testify on the issue. The court can con-

ceive of possible areas for competing medical testimony; for example, the alarming rise in Messier's creatinine level over the course of just a few days might suggest that the onset of his lymphoma was swift and sudden, rather than gradual. But Bouchard offers no medical evidence that would buttress such an inference. As a result, Defendant has failed to raise a genuine issue of material fact concerning Dr. Brant's qualifications and/or methodology.

reach the issue. Neither is dispositive of the issue presented by this case.

In *Stevens v. McGinnis, Inc.*, 82 F.3d 1353, 1355 (6th Cir.1996), the district court determined, as a matter of fact, that the plaintiff's tumor caused headaches and personality changes while the plaintiff was working aboard the defendant's vessel. For that reason, the district court found that the tumor "manifested itself" during Stevens' employment and that the defendant was responsible for maintenance and cure. *Id.* It did not matter to the district court that the disease was not definitively diagnosed until after the end of plaintiff's service on defendant's ship. *Id.*

On appeal, the defendant contended that the seaman had not manifested the disease because it was not diagnosed until after he left the shipowner's employ. *Id.* at 1358. The Sixth Circuit framed the question as follows: "Must the [defendant] pay maintenance and cure only when a seaman's illness is diagnosed during his employment, or must the company pay maintenance and cure to any seaman whose illness *caused symptoms* during his employment, even if the illness is not diagnosed until after the seaman's employment terminates?" *Id.* at 1359 (emphasis added). Because the trial court found as a matter of fact that the plaintiff's disease "caused symptoms" during the period of his employment, the Court of Appeals, by 2–1 vote, concluded that the seaman was entitled to maintenance and cure. *Id.*

The Stevens majority noted that the concept of "manifestation" was designed "to help distinguish between illnesses and injuries actually caused by a seaman's employment and those which *merely come to be known* during his employment," *Id.* (Emphasis added). A disease "comes to be known" when the person who has it exhibits symptoms that are obvious, whether to himself or to others; in short, the idea of a

disease's "coming to be known" is consistent with the dictionary definitions of "manifestation" cited above. In *Stevens*, the seaman's headaches and personality changes made the disease "known" while he was in the service of the ship, even though a formal diagnosis did not come until later. *Id.* at 1356.

In reaching its conclusion, not only did the *Stevens* court fail to define the verb "manifest," but the majority at least suggested that certain Supreme Court precedents (which will be discussed below) basically did away with the concept of "manifestation" altogether. *Id.* at 1358–1359. As a result, the *Stevens* majority (over a vigorous and well-reasoned dissent) acknowledged that its decision could be read to support the proposition that maintenance and cure could be awarded "based solely on the presence of an insidious disease during a seaman's employment." *Id.* at n. 5. However, the court said its ruling did not, in fact, "go quite so far, [ ] *because in this case, the district court found that Stevens suffered from symptoms of the tumor while employed by the company.*" *Id.* (Emphasis added). Since Stevens actually exhibited symptoms of his illness while in the service of his ship, the court did not need to decide whether the existence of an insidious but asymptomatic disease would entitle a seaman to maintenance and cure, and so refused to reach the precise issue that confronts this court. *Id.*

In *Shaw v. Ohio River Co.*, 526 F.2d 193 (3d Cir.1975), the meaning of "manifest" was a side issue, if it was an issue at all. As in most of the maintenance and cure cases that this Court has become familiar with, the *Shaw* court was principally concerned about whether the plaintiff seaman was "in the service of the ship" at the time she manifested the disease. *Id.* at 194. In *Shaw*, the plaintiff was diagnosed with a

breast tumor while on shore leave. *Id.* at 194–195. The court held that the plaintiff was not entitled to maintenance and cure because she "was not answerable to the call of duty when she was *stricken* ... with [her] illness" and her illness "*did not manifest* [itself] while [the plaintiff] [was] in the service of the vessel." *Id.* at 198. (Emphasis added). The *Shaw* court pointed out that the plaintiff's breast tumor was discovered during a routine physical examination and there had been no prior symptoms or complaints of the condition. *Id.* at 196–197. It seems obvious that the plaintiff was afflicted ("stricken") with her cancer while she was on duty; breast tumors do not appear overnight. However, the Third Circuit appears to have assumed (without discussion) that an asymptomatic illness had not yet "manifested" (or presented, or occurred), *See Id.* at 198–199.

*Shaw* was not mentioned by the Sixth Circuit in *Stevens*. However, the district court in *Stevens* criticized *Shaw*'s holding as "not in accord with the modern doctrine of maintenance and cure." *Stevens v. McGinnis, Inc.*, 1994 WL 1071681, at *3 (E.D.Ky. August 5, 1994), *aff'd*, 82 F.3d 1353 (6th Cir.1996) (*citing* Norris, *Law of Seamen* §§ 26.3 to 26.8 (4th Ed. 1985 & Supp. 1994)). This criticism, as it turns out, had nothing to do with how the court viewed manifestation; rather, it was directed to the Third Circuit's interpretation of the phrase "in the service of the ship." The *Shaw* court read that phrase narrowly, to exclude shore leave in the context of regular crew changes aboard a vessel. *See*

*Shaw*, 526 F.2d at 197–198.[5] In this case, the parties do not dispute that Messier did not show symptoms while he was "in the service of the ship," and that he was not "in the service of the ship" (i.e., he was not answerable to the call of duty) when he finally showed symptoms of his cancer. Here, the dispute concerns the meaning of "manifests," and the *Shaw* court did not discuss the meaning of that term.

So *Shaw* and *Stevens*, while interesting, have less to teach than one might wish.

Two district courts have ruled that a seaman can recover for maintenance and cure if he has an undiagnosed illness during the term of his employment.

In *George v. Chesapeake & O. Ry.*, 348 F.Supp. 283 (E.D.Va.1972), the facts are dramatically different from those at bar—and are closely analogous to those in *Stevens*. The plaintiff seaman in *George* worked as a marine employee for the same employer (defendant Chessy) for forty-eight years. He suffered recurrent sores in his mouth and gums for the last fifteen years of his employment. *Id.* at 284–285. Finally, George developed a sore that would not go away; he sought treatment from a doctor and was diagnosed with cancer. *Id.* The district court admitted that it could not determine precisely when the cancer commenced, or where it first manifested itself. *Id.* at 287. However, the court ruled that George was entitled to maintenance and cure, stating that despite the "grave doubt as to the exact time the cancer commenced ... it may be said with certainty that the disease originated, pro-

---

**5.** In focusing on the phrase "in the service of the ship," the *Shaw* court was working out the meaning of a term of art that has been at the heart of the development of the modern jurisprudence on maintenance and cure. As discussed in Norris' treatise *The Law of Seamen*, since the Supreme Court's decision in the *Aguilar* case, courts have displayed a tendency to toward applying liberal interpreta-

tions of "in the service of the ship." 2 R. Force & M. Norris, *Law of Seamen*, § 26.19 (5th Ed. 2002). In *Shaw*, however, the court adopted a more conservative reading, ostensibly because the parties' collective bargaining agreement provided that plaintiff was not subject to the call of service while she was on shore leave. *Id.*

gressed, and previously manifested itself while George was employed as a seaman for C & O." *Id.* The district court specifically found that George had exhibited manifested symptoms of his cancer during his nearly half century of working for C & O; that makes his case easy compared to this one, where it is undisputed that Plaintiff exhibited not a single symptom of lymphoma until after he ceased his employment with Bouchard.

By contrast, the facts in *Petition of the United States*, 303 F.Supp. 1282 (E.D.N.C. 1969) *aff'd per curiam*, 432 F.2d 1357 (4th Cir.1970) resemble the facts of this case. In *Petition*, the plaintiff, a seaman named John Smith, suffered injuries when he jumped into the water to escape the explosion of the ship *Potomac*. 303 F.Supp. at 1310–1311. After arriving ashore, Smith reported to a hospital, complaining of cough, nervousness and insomnia. Within a month, Smith was diagnosed with an advanced carcinoma of the left lung, from which he died two months later. *Id.* There was ample medical testimony that Smith (a heavy smoker) had developed his lung cancer well before it was diagnosed-indeed, well before the date of the explosion that indirectly led to the discovery of his illness. *Id.* The decision does not mention whether Smith exhibited any of the common symptoms of advanced lung cancer (such as persistent cough or shortness of breath) while he was in the service of the *Potomac*.

In an action by Smith's administratrix to recover maintenance and cure, the court held that plaintiff's "claim for maintenance and cure is valid *even though the lung cancer may not have manifested itself while in the service of the ship*. Obviously Smith had the malignancy while aboard the Potomac." *Id.* at 1313 (emphasis added). The *Petition* court appears to have assumed that an asymptomatic disease does not "manifest," although it does not discuss why this is so. However, it does away with the concept of manifestation, by holding squarely that *having* a disease— even a disease that does not "manifest"—is enough to trigger the right to maintenance and cure. *Id.*

Of course, the holding of a sister district court in *Petition* is not binding on this court, and Bouchard argues that I should ignore it—not only because of who decided the case, but also because the opinion cites not a single source to support the proposition that maintenance and cure are available absent manifestation of symptoms. (Def. Rep. Mem. Sum. J. at 4.) Bouchard argues that a holding that allowed a seaman to recover maintenance and cure for a disease that manifested not a single symptom while he was in the service of the ship would do what the court in *Stevens* specifically declined to do: render a shipowner liable for any slow-growing or insidious disease (like a cancer) that may lurk inside a seaman's body while he is engaged in marine work—even if it did not affect the seaman's service at all, and even if the disease does not emerge until years after the seaman leaves the service of the ship.

Bouchard's argument has considerable force as a policy matter. The doctrines of maintenance and cure arose at a time when an understanding of disease process was primitive to non-existent. The concept that a slow-growing, symptomless disease might lurk inside a human body for years or decades was undreamed of in the Middle Ages; it strains the bounds of reason to conclude that a seaman who became ill during or after a voyage in 1492 could have recovered maintenance and cure from a prior shipowner on the ground that the disease was lurking in his bloodstream in 1489.

Extending maintenance and cure to illnesses that are asymptomatic during a

seaman's service, and that are not shown to have been caused by the seaman's occupation,[6] does not further any of the policies behind maintenance and cure, which the Supreme Court in *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528, 58 S.Ct. 651, 82 L.Ed. 993 (1938) identified as: (1) the protection of seamen from the hazard of illness and abandonment while ill in foreign ports; (2) inducement of masters and owners to protect the safety and health of seamen while in service; and (3) maintenance of a merchant marine for the commercial service and maritime defense of the nation. Furthermore, the beauty of maintenance and cure, as noted by no less an authority than the United States Supreme Court, is its simplicity: "It has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple, and can be understood and administered without technical considerations....." *Farrell, supra*, 336 U.S. at 516, 69 S.Ct. 707. Holding that the doctrine applies to diseases that are completely asymptomatic while the seaman is in the service of the ship will inevitably lead to exceedingly complicated litigation over when a seaman first contracted a particular slow-growing disease (such as cancer), with the possibility that remote shipowners can be brought into actions as third party defendants if a defendant shipowner adduces medical evidence that the plaintiff "had" his disease while in the service of a different ship. By contrast, allowing maintenance and cure only when the seaman's disease or injury is evident during his period of service to the ship fixes a bright line rule that is consistent with the "merit" of the doctrines.

There is one more case that merits discussion: the Supreme Court's decision in *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). The majority in *Stevens* reached its decision in reliance on *Vaughan*, and made statements in its opinion suggesting that *Vaughan* would foreclose Bouchard's arguments. *Stevens*, 82 F.3d at 1359 n. 5. Those statements were the basis of the *Stevens* majority's observation that its opinion "could be read" to cover situations like Messier's—a reading the court promptly repudiated. *Id.* After careful perusal of the Supreme Court's opinion, I disagree.

Seaman Vaughan served on respondent's vessel until March 2, 1957. *Vaughan*, 369 U.S. at 528, 82 S.Ct. 997. He entered the hospital five days after his discharge and was diagnosed with tuberculosis, from which he suffered for several years until he was declared fit for duty. *Id.* During his service aboard respondent's vessel, he ostensibly did not complain of any symptoms of disease. However, before he was discharged from service, the Master furnished Vaughan with a certificate to enter the hospital upon his discharge—a critical fact, and one that suggests both Vaughan and the Master knew that Vaughan was not a well man when he left the ship. Nonetheless, Vaughan's claim for maintenance and cure was not recognized by the shipowner, and Vaughan brought suit therefor. *Id.* at 528–529, 82 S.Ct. 997.

The only issue before the Supreme Court in *Vaughan* was whether the seaman could recover the attorneys' fees he incurred in bringing what was ultimately a successful suit. *Id.* at 529–530, 82 S.Ct.

**6.** Here there is no evidence that the plaintiffs lymphoma was caused by anything having to do with his work for Bouchard, so the *Wills* doctrine that permits maintenance and cure for diseases that do not present during a seaman's service when the disease was caused by his work does not come into play.

997. However, in the course of reversing lower court rulings that had denied Vaughan his attorneys' fees, the Supreme Court approved the allowance of maintenance and cure, saying (in dicta) that they were "plainly owed." *Id.* at 531, 82 S.Ct. 997.

The majority in *Stevens* believed that the *Vaughan* court had endorsed a seaman's right to maintenance and cure even though the seaman in that case did not complain of any illness while in the service of the ship. *Stevens,* 82 F.3d at 1359. But as the dissent in *Stevens* pointed out, the majority's belief is plainly inconsistent with the key fact in *Vaughan—the Master had issued the seaman a hospitalization certificate upon his discharge. Id.* at 1361–1362 (Wellford, J., dissenting),

I have read *Vaughan* carefully, and I read it as does the dissent in *Stevens.* Nothing in the Supreme Court's opinion suggests that the seaman was completely asymptomatic during his service to the ship, or that the court thought he was completely asymptomatic. Rather, the opinion suggests that the Master who issued Vaughan the hospitalization certificate lied to the owner about Vaughan's symptoms during an investigation into the seaman's claim—an investigation that the Supreme Court found utterly inadequate. *Vaughan,* 369 U.S. at 528–529, 82 S.Ct. 997.

It is true, as the *Stevens* majority observed, that in *Vaughan,* the Supreme Court quoted *Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 528, 58 S.Ct. 651, 82 L.Ed. 993 (1938), for the proposition that "Maintenance and cure is designed to provide a seaman with food and lodging when he *becomes* sick or injured in the ship's service...." (Emphasis added). The Sixth Circuit majority, focusing on the word "becomes," emphasized that the *Vaughan* court made "no mention of manifestation

at all." *Stevens, supra,* 82 F.3d at 1359. One can become sick or injured without manifesting immediate symptoms; Messier himself is the proof of that. However, in *Taylor,* Supreme Court also said, "Where the seaman suffers from a disease 'which *manifests* itself during his employment, but is not caused by it,' the shipowner's duty is to [provide maintenance and cure].... " *Stevens,* 82 F.3d at 1357 (*quoting Taylor,* 303 U.S. at 530, 58 S.Ct. 651). The Supreme Court said nothing in *Vaughan* to suggest that it was reading the *Taylor* language about manifestation out of the law of maintenance and cure—and given the Master's issuance of a hospitalization certificate to Seaman Vaughan, there appears to have been no need for the Supreme Court (or any lower court) to grapple with the issue.

Ironically, the majority in the *Stevens* panel—which emphasized the *Vaughan* court's failure to mention the concept of "manifestation"—not only quoted this very sentence about manifestation from *Taylor,* see *Stevens, supra,* 82 F.3d at 1357, but also stated, "[I]n *Taylor,* the Supreme Court chose [the verb manifest] to help distinguish between illnesses and injuries actually caused by a seaman's employment *and those which merely come to be known during his employment." Id.* at 1358 (emphasis added). In this case, it is undisputed that Messier's lymphoma did not "come to be known" during his employment—unlike Vaughan, whose illness plainly came to be known (at least to the Master who issued his hospitalization certificate) while he was in the ship's service. The *Stevens* majority's discussion of *Taylor* suggests that the Supreme Court might well require that a medical condition be apparent ("come to be known") while a seaman was in the service of the ship before he would be entitled to maintenance and cure.

In the end, of course, the *Stevens* court declined to decide whether a wholly asymptomatic disease that "comes to be known" shortly after a seaman ceases to be in the service of the ship merits an award of maintenance and cure. *Id.* at 1358–1359. This means that the *Stevens* majority's emphasis on the *Vaughan* court's failure to mention the concept of "manifestation" is itself dicta—and dicta that is undercut by the actual facts of *Vaughan.* I cannot conclude that *Vaughan* compels, or even supports, a finding in Messier's favor.

So where does this leave us?

 A shipowner's obligation for maintenance and cure has unquestionably broadened over the years, to the point where these remedies are far, far more liberal than any worker's compensation program. However, this Court has found only one case—*Petition*—in which maintenance and cure was awarded solely on the basis of an insidious and wholly asymptomatic disease that (apparently) failed to manifest until after the seaman was discharged from service to the ship. No other court has ever done away with the notion, plainly articulated by the United States Supreme Court in *Taylor,* that a disease or injury not caused by the seaman's service must "manifest"—i.e., must exhibit itself, or show symptoms—during the period of service to the ship. The dictionary definition of "manifest" is consistent with the numerous cases holding that a seaman is entitled to maintenance and cure, regardless of when the disease was definitively diagnosed, as long as he showed symptoms of the disease during his tour of duty—whether those symptoms were headaches (*Stevens* ) or lesions of the mouth and gums (*George* ) or whatever unidentified symptoms that caused the Master to issue a hospitalization certificate to Seaman Vaughan (*Vaughan* ). I can see

no reason to extend the applicability of maintenance and cure to diseases that were not "made evident or certain by showing or displaying" symptoms during service to a ship—and many reasons why one ought not to do so.

I thus choose to adopt the principle that was followed, either expressly or by implication, in every case except *Petition.* Because Plaintiff's own testimony indicates that he failed to manifest his lymphoma while he was in the service of the ship, he is precluded from receiving maintenance and cure under his first theory.

### C. Plaintiffs Alternative Theory: Because His Cancer Manifested While He Was Otherwise Entitled to Maintenance and Cure, He Can Receive Maintenance and Cure for the Lymphoma

In the alternative, Messier argues that he is entitled to maintenance and cure for his lymphoma because it manifested at a time when he was entitled to maintenance and cure for the back injury that he suffered while in the service of the ship. I disagree.

 Under general maritime law, when a seaman who is receiving maintenance and cure for one condition manifests a second illness or injury—even one that is unrelated to his original illness or injury—the seaman is entitled to maintenance and cure for the second injury or illness. *Brassea v. Person,* 985 P.2d 481, 2000 AMC 214 (Alaska 1999). By way of illustration of the principle: in *Gauthier v. Crosby Marine Service, Inc.,* 499 F.Supp. 295 (E.D.La.1980), *reconsidered,* 536 F.Supp. 269 (E.D.La.1982), *aff'd,* 752 F.2d 1085 (5th Cir.1985) the plaintiff, a seaman named Leonard Gauthier, sustained an injury to his groin while employed by Crosby Marine Service. 499 F.Supp. at 297. Gauthier received treatment that did not

cure his injury, but enabled him to return to work. *Id.* While employed on a vessel owned by another company, L. Griffin, Inc., Gauthier's groin injury flared up and he went to the hospital for surgery. *Id.* at 297–298. Routine pre-operative testing showed that Gauthier suffered from serious multiple coronary heart blockages, which required immediate open-heart bypass surgery before his groin condition could be addressed. *Id.* The heart "condition was long-standing and existed while [Gauthier] was in the employ [of both Crosby Marine Services and L. Griffin]." *Id.* at 298. Finally, while recuperating from the bypass surgery (and awaiting the groin surgery that sent him to the hospital in the first place), Gauthier developed a noninfectious hepatitis. *Id.* The Court concluded that Gauthier's employers were liable for maintenance and cure relating to all three issues—the groin, the heart blockage and the hepatitis. *Id.* at 301. It mattered not that the latter two conditions were unrelated to the groin injury, for which he was indisputably entitled to maintenance and cure; the court deemed it sufficient that these conditions manifested while he was entitled to maintenance and cure for the groin injury. *Id.* at 300.

██ Bouchard does not dispute the existence of the rule on which the *Gauthier* court relied, but argues that the rule is not applicable here, because Messier was not receiving maintenance and cure for his back injury at the time his cancer was discovered—or at any time thereafter. Bouchard avers that Messier was not disabled by his back injury and never reported the injury to the company. There is only a passing mention of Messier's back injury in his medical records. And Messi-

er testified at his deposition that his back pain was gone "within a couple of days" after his initial visit to Dr. Ruben. (Walsh Aff'n, Ex. B at 79.) It is undisputed that Messier never even put in for maintenance and cure for his back injury.

Plaintiff counters that there is no evidence to controvert Messier's claim that he injured his back while disembarking the Evening Mist. It is undisputed that Messier's initial visit to Dr. Ruben was occasioned by the back injury. It is also undisputed that Plaintiff's pain persisted for several days after that initial visit. Rather, Plaintiff argues that he need not have been receiving maintenance and cure—or even have even made a claim for maintenance and cure for his back injury—in order to recover under what I will call the *Gauthier* doctrine. He acknowledges, however, that not a single court has ever so held.

I will assume, for purposes of argument, that Plaintiff could have established a right to reimbursement under the doctrine of cure for the relatively modest medical expenses he incurred in connection with what was diagnosed as a mildly sprained back. This appears to be consistent with the Supreme Court's holding that a seaman becomes entitled to maintenance and cure from the time he first makes expenditures or incurs liability for medicines, nursing or other medical care relating to an injury that occurs or an illness that manifests while he is in the service of the ship. *Taylor, supra,* 303 U.S. at 527–528, 58 S.Ct. 651. In Messier's case, that means he became entitled to maintenance and cure for his back injury on October 25, when he visited Dr. Ruben.[7]

7. As Messier was not disabled by his back injury—and there is absolutely no evidence that he was—it is not clear to me whether Plaintiff could recover maintenance at all; and as his pain ended within days of his first

visit to the doctor, it is not clear for how long he could recover cure. At most, on the record before me he would have been eligible for maintenance and cure for his back injury for a matter of days—probably not even a week.

 

However, Plaintiff admits that he never sought maintenance or cure for his back injury, let alone was collecting same when the first symptom of his lymphoma appeared. In every case the parties cite, and in every case the court has located, a seaman who becomes eligible for maintenance and cure for a second illness or injury manifested that second illness or injury while he was receiving maintenance and cure for a prior condition. *See Brassea, supra*, (maintenance and cure awarded for two surgeries when a seaman incurred an inguinal hernia on the boat and during surgical repair a second unrelated hernia was discovered and repaired in a second surgery); *see also Duarte v. Royal Caribbean Cruises*, 761 So.2d 367 (Fla. Dist.Ct.App.3d Dist.2000) (a seaman already receiving maintenance and cure for several months when she suffered a second injury was thus entitled to maintenance and cure for the second injury as well). Because Plaintiff was not receiving maintenance and cure when his lymphoma became apparent, his alternative theory of recovery fails.

As neither of Plaintiff's theories entitles him to relief, Defendant's cross motion for summary judgment dismissing the complaint is granted, and Plaintiff's motion for summary judgment is denied.

### III. MOTION TO AMEND THE COMPLAINT

In view of the foregoing ruling on the issue of Plaintiff's entitlement to maintenance and cure as a matter of law, his motion for leave to amend his complaint is denied as moot.

### *CONCLUSION*

The Clerk of the Court is directed to enter an order denying Plaintiff's motion for summary judgment and granting Defendant's cross motion for summary judgment dismissing the complaint. The Clerk is directed to remove the motions at Docket Nos. 10, 14, 28 and 32 from the Court's list of pending motions.